IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

GORDON ANDREW DOUGLAS,

Petitioner, No. CIV S-97-0775 FCD JFM P

vs.

STEVE CAMBRA, et al.,

Respondents. FINDINGS AND RECOMMENDATIONS

_________________________________/

Petitioner is a state prisoner proceeding through counsel with an application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 1993 conviction on charges of first degree murder and arson of an inhabited dwelling, and the sentence of thirty-three years to life in prison imposed thereon on March 5, 1993. Petitioner raises 11 claims in his second amended petition, filed December 7, 1998, that his prison sentence violates the Constitution.

PROCEDURAL HISTORY

On August 18, 2000, petitioner's claims that were raised in his state habeas petition but not in his petition for review were dismissed as procedurally defaulted. On July 19, 2004, the Court of Appeals for the Ninth Circuit reversed and remanded,[1] holding that petitioner

[1] The dismissal of two claims on the merits was also affirmed. Douglas v. Cambra, No. 00-56747 (July 14, 2004) at 3 (Docket No. 38.) The two claims were that petitioner was denied

did not have sufficient notice or opportunity to prepare arguments regarding the adequacy of procedural rules under the standard described in Bennett v. Mueller, 322 F.3d 573 (9th Cir. 2003). On October 13, 2004, the court ordered further briefing. On June 22, 2005, the assigned magistrate judge issued findings and recommendations concluding that petitioner's remaining claims should be dismissed as procedurally barred.

On August 26, 2005, the district court declined to adopt the June 22, 2005 findings and recommendations and remanded the case for further proceedings consistent with that order. The district court found that petitioner had provided competent evidence to meet his burden in raising the question of consistent application required by Bennett. Id., 322 F.3d at 586, citing Morales v. Calderon, 85 F.3d 1387 (9th Cir. 1996)(evidence of 35 post-card denials demonstrated inconsistent application of California's timeliness bar in a pre-In re Clark capital case). The district court explained that "[a]s a result the burden shifts to respondent to satisfy its ultimate burden to demonstrate consistency." (Order filed August 26, 2005, at 5.) The assigned magistrate judge issued a briefing order on September 2, 2005. On September 7, 2005, respondent filed its response, stating it would "not attempt to produce any evidence to demonstrate that California's timeliness bar has been consistently applied. Rather, respondents ask this Court to rule on the merits of Petitioner's remaining claims, while allowing respondents to preserve the procedural issue for possible appeal." (Id. at 2.)

FACTS[2]

> During either the evening of February 6 or the early morning of February 7, 1992, the victim, Jack Clark, was attacked in his residence. He was stabbed 10 times in the neck and upper back and died of the wounds inflicted. Shortly before 5 a.m. on the

---

due process when the trial proceeded after the state's key witness improperly testified that he had passed a lie detector test and that his trial counsel was ineffective because he failed to provide petitioner with all evidence relevant to his decision to accept or reject a plea offer. (Id.)

[2] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Douglas, No. C015431 (April 1, 1994), a copy of which is attached as Exhibit A to Respondent's Answer, filed January 27, 1999.

seventh, a fire was deliberately set in the victim's residence. It was discovered shortly thereafter and extinguished.

When police and fire department personnel arrived, they discovered the front door had been forced open. There were only a few items of furniture inside as the victim had recently sold the residence and was in the process of vacating. A microwave oven was missing. It had been observed in the residence one week earlier and was used by the victim to prepare his meals.

Several days after the murder, the victim's blue Toyota Celica was discovered parked on a street three or four miles from his residence. Residents in that vicinity indicated the vehicle had arrived between midnight and 12:30 a.m. the night of the murder and had not been moved since.

On March 10, [petitioner's] brother Johnny Douglas approached a police officer and indicated he had information regarding a murder. Johnny Douglas repeated to the officer what [petitioner] had told him about the Clark murder. According to Johnny, [petitioner] and his brother James Douglas broke into the victim's residence intending to rob him, but the victim saw their faces and James stabbed the victim in the neck. James was drunk and did not know what he was doing, so [petitioner] grabbed the knife and continued to stab the victim. [Petitioner] and James split the victim's money, loaded the victim's belongings into his car and left. Later, they returned to the residence and started the fire in order to destroy any fingerprints they might have left. The next morning, James panicked and fled.

At the time of the murder, [petitioner's] sister, Kimberly Douglas, lived half a block from the victim's residence. [Petitioner] and James stayed with Kimberly that night. Kimberly went to bed at approximately midnight and awoke between 1:30 and 2 a.m. [Petitioner] and James had just returned from a liquor store. Kimberly went back to sleep and woke again at approximately 5 a.m. due to the commotion surrounding the fire. [Petitioner] and James were in the apartment. Kimberly returned to bed and did not arise until sometime before 9 a.m., at which time [petitioner] was present but James was gone. Kimberly discovered a microwave oven in her closet and asked [petitioner] about it. [Petitioner] told her she could keep it, that he had gotten it for her. [Petitioner] slept the rest of the day in Kimberly's apartment.

Numerous items from the victim's residence and car were checked for fingerprints. Twenty-eight latent prints were examined in all. Many matched the victim. One, taken from a raincoat pouch found in the victim's car, matched [petitioner]. None matched either Johnny or James.

The theory of the defense was that there were two other possible perpetrators of the crimes, Gloria Thomas and Johnny Douglas. Gloria Thomas was a prostitute who had known the victim for a number of years. The victim had first contracted for Thomas's services but then the two became friends, and the victim helped her financially on occasion.

In 1989, Thomas had been accused of arson of the victim's residence. According to Thomas, she and the victim had been in an argument and the victim locked her in the residence and turned off the power. The fire started when Thomas ignited matches for illumination and accidently dropped them into a paper trash bag. An arson investigator had suggested the fire may have been set deliberately.

Thomas testified she had broken off her relationship with the victim and had not been to his residence since October, several months before the murder. However, a neighbor of the victim testified he saw Thomas at the residence on more than one occasion over the Thanksgiving, Christmas and the New Year holidays.

Several witnesses testified they heard the voice of a black woman yelling near the victim's residence in the early morning hours before the fire was set. Thomas is black. One witness indicated he heard the woman say something to the effect "I fixed him good this time or I–I showed that son-of-a-bitch good this–this time." The woman sounded as if she had been coming from the direction of the victim's residence. Another witness testified he heard a black woman yell, "You bastard, let me in." According to this witness, the voice was similar to one he heard say the same thing of the 1989 fire. A third witness heard a black woman yelling outside at about 2 a.m. and again an hour later. The woman was cursing and at one point used the term "son of a bitch."

Several family members testified [petitioner] and his brother Johnny did not get along. They also indicated Johnny was untrustworthy. However, Johnny's wife testified she, Johnny, Johnny's sister Cynthia, and several children were out panhandling that evening. Johnny and his wife got into an argument outside an AM/PM store. The argument was witnessed by bystanders at

/////

/////

/////

/////

/////

> approximately 12:20 a.m., police were summoned and Johnny was arrested. Johnny was incarcerated and not released until February 28.[3]

(People v. Douglas, slip op. at 2-5.)

ANALYSIS

I. Standards for a Writ of Habeas Corpus

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of some transgression of federal law binding on the state courts. See Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)). A federal writ is not available for alleged error in the interpretation or application of state law. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000); Middleton, 768 F.2d at 1085. Habeas corpus cannot be utilized to try state issues de novo. Milton v. Wainwright, 407 U.S. 371, 377 (1972).

This action is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). See Lindh v.Murphy, 521 U.S. 320, 336 (1997); Clark v. Murphy, 331 F.3d 1062, 1067 (9th Cir. 2003). Section 2254(d) sets forth the following standards for granting habeas corpus relief:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

/////

[3] Cynthia testified she was not with Johnny and his wife that evening, implying perhaps Johnny too had not been there, at least not until the argument. However, the officer who arrested Johnny testified there had been another woman with Johnny and his wife.

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). See also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F.3d 1223, 1229 (9th Cir. 2001).

The court looks to the last reasoned state court decision as the basis for the state court judgment. Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under section 2254(d). Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003); Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). When it is clear that a state court has not reached the merits of a petitioner's claim, or has denied the claim on procedural grounds, the AEDPA's deferential standard does not apply and a federal habeas court must review the claim de novo. Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003); Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The claims remaining here were all rejected on procedural grounds in state court, so there is no reasoned opinion supporting rejection of the claims considered below. Accordingly, this court reviews the claims de novo.

II. Petitioner's Claims

A. Claim One

Petitioner's first claim is that he was denied due process under the Fifth and Fourteenth Amendments to the Constitution when the jury convicted him of first degree murder when there was no evidence to justify felony murder, with robbery as the underlying felony.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." In re Winship, 397 U.S. 358, 364 (1970). There is sufficient evidence to support a conviction if, "after viewing the evidence in the light most

favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). See also Prantil v. California, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam). "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318). A petitioner for a federal writ of habeas corpus "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds." Juan H. v. Allen, 408 F.3d 1262, 1274, 1275 & n.13 (9th Cir. 2005).

The court must review the entire record when the sufficiency of the evidence is challenged in habeas proceedings. Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987). It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319. If the trier of fact could draw conflicting inferences from the evidence, the court in its review will assign the inference that favors conviction. McMillan v. Gomez, 19 F.3d 465, 469 (9th Cir. 1994). The relevant inquiry is not whether the evidence excludes every hypothesis except guilt, but whether the jury could reasonably arrive at its verdict. United States v. Mares, 940 F.2d 455, 458 (9th Cir. 1991). Thus, "[t]he question is not whether we are personally convinced beyond a reasonable doubt. It is whether rational jurors could reach the conclusion that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991). The federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law. Jackson, 443 U.S. at 324 n.16; Chein, 373 F.3d at 983.

The evidence adduced at petitioner's trial is set forth above. As respondent points out, there was evidence to support a first degree murder conviction based on felony murder resulting from robbery. (Supp. Answer at 10.) The prosecution argued the following evidence supported that theory: testimony that petitioner told his brother he had gone to the victim's

house to take property, evidence that a microwave oven was stolen from a location close to where the victim was found and circumstantial evidence that cash had been taken from the victim's residence and his car. (RT 1068-69.)

The undersigned has reviewed the transcripts and record of the proceedings leading to petitioner's conviction and concludes that sufficient evidence was presented at trial to support the jury's finding that the murder was committed in the commission or attempted commission of a robbery. Johnny Douglas, petitioner's brother, testified that petitioner told him the following:

> James and petitioner committed a burglary, a murder and burned down the house in which they committed the murder. (RT 514.) Petitioner and James went to the house together and kicked the door in. (RT 515.) James was "maybe drunk." (RT 515.) There was an old man in the house. (RT 515.) James stabbed the victim in the neck area. (RT 516.) James "was drunk, didn't know what he was doing." (RT 517.) James was possibly drunk, tried to stab the victim in the neck but hit a bone, or didn't know what he was doing. (RT 527.) Petitioner took the knife from James and petitioner stabbed the victim. (RT 517.) James asked petitioner if the victim was dead yet and petitioner said he will be dead because of the location where he stabbed him. (RT 520.)
>
> Petitioner and James each took a share of the victim's money. (RT 520.) Petitioner and James took things that belonged to the victim from inside the victim's house. (RT 518.) Petitioner and James took the victim's car and the belongings that were in it. (RT 517.)
>
> Petitioner and James returned to the house to burn it down to destroy any fingerprints they might have left inside. (RT 518.)

After petitioner told Johnny what had happened, Johnny immediately walked down Broadway to find a policeman to tell him what petitioner had done. (RT 525.) Johnny

testified he told the police because he was fearful for the safety of himself and his family. (RT 525; see also RT 556.)

Kimberly Douglas, petitioner's sister, testified that the morning after the fire, she discovered a microwave oven in her hall closet. (RT 408.) Petitioner told Kimberly he had gotten her a microwave. (RT 411.) Johnny asked Kimberly whether the microwave had come from the victim's house; "she didn't answer me, she laughed." (RT 552.) Petitioner's fingerprint was found on a raincoat pouch found in the victim's car.

Pursuant to California law, a robbery is defined as "the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force and fear," with the intent to permanently deprive the victim of his or her property, and with an act of force or intimidation motivated by the intent to steal. Cal. Penal Code § 211; People v. Dominguez, 38 Cal. App. 4th 410, 417 (1995); People v. Brito, 232 Cal. App. 3d 316, 324 n.7 (1991). If the elements of robbery are proven, the robbery attaches as a "special circumstance" to a murder if the murder was committed while the defendant was "engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit" the robbery. Cal. Penal Code § 190.2(17)(A).

The testimony at petitioner's trial was sufficient to establish that he intended to steal from the victim and that he murdered the victim while he was engaged in the robbery. In addition, the jury in petitioner's case was instructed that "[e]very person who takes personal property from the possession of another against the will and from the personal and immediate presence of that person accomplished by means of force or fear and with the specific intent to permanently deprive such person of such property, is guilty of the crime of robbery in violation of Penal Code Section 211." (RT 1045.) The jury was admonished that each element of robbery must be proved. (RT 1045.) The jury was specifically cautioned that "[t]he crime of robbery requires the taking of property from the immediate presence of a living person. Robbery does not

occur where property is removed from the immediate presence of a[n] individual after death." (RT 1045.)

The jury found petitioner guilty of first degree murder using a general verdict form that did not contain any special findings. (CT 126.) The jury apparently rejected the defense theory that the crime was committed by someone else or that the prosecution failed to meet its burden of proof. The test for this court is not whether petitioner's version of the events is plausible, but whether rational jurors could reach the conclusion these jurors reached. Roehler, 945 F.2d at 306. Viewing the evidence in the light more favorable to the prosecution, as the court is required to do, the undersigned concludes that a rational juror could have found robbery as the underlying felony allegation to be true. Accordingly, petitioner is not entitled to relief on his claim challenging the sufficiency of the evidence upon which he was convicted.

However, even assuming that there was insufficient evidence to support robbery as the underlying felony, petitioner's conviction is valid because there was sufficient evidence to support his conviction on alternative grounds. See Griffin v. United States, 502 U.S. 46, 59-60 (1991); People v. Guiton, 4 Cal.4th 1116, 17 Cal.Rptr.2d 365 (Cal.1993). A verdict cannot be negated "on the chance . . . that the jury convicted on a ground that was not supported by adequate evidence when there existed alternative grounds for which the evidence was sufficient." Griffin, 502 U.S. at 59-60, quoting United States v. Townsend, 924 F.2d 1385, 1414 (7th Cir. 1991). The prosecution introduced evidence, which if believed, could support a finding of first degree murder based on felony murder resulting from burglary. The jury was specifically instructed that it could not find petitioner guilty of first degree murder on a felony murder theory unless the jury was "independently convinced beyond a reasonable doubt that he is guilty of the commission or attempted commission of either burglary or robbery." (RT 1044.) In such a case, "because a jury is 'equipped to analyze the evidence[,]' . . . a court may assume that it rested its verdict on the ground that the facts supported." Keating v. Hood, 191 F.3d 1053, 1062 (9th Cir.1999) (quoting Griffin, 502 U.S. at 59).

Petitioner cites Stromberg v. California, 283 U.S. 359, 367-68 (1931) and other cases that applied "what Williams v. North Carolina, 317 U.S. 287, 292 (1942) called 'the rule of the Stromberg case' to general-verdict convictions that may have rested on an unconstitutional ground," Griffin, 502 U.S. at 55. (Am. Pet. at 3-4.) However, the Griffin court called Stromberg "the fountainhead of decisions departing from the common law with respect to the point at issue here," Griffin 502 U.S. at 52, distinguishing the cases cited by petitioner. The Griffin court clarified that "the holding of Stromberg [] do[es] not necessarily stand for anything more than the principle that, where a provision of the Constitution forbids conviction on a particular ground, the constitutional guarantee is violated by a general verdict that may have rested on that ground. Griffin, 502 U.S. at 53. Because neither alternative in the instant case was forbidden under the Constitution, petitioner's reliance on these cases is unavailing.[4]

Accordingly, petitioner's first claim for relief should be denied.

B. Second Claim

Petitioner's second claim is that he was denied due process under the Fifth and Fourteenth Amendments to the Constitution when the prosecution was permitted to change the arson charges against petitioner after the government rested its case.

> The Sixth Amendment guarantees a criminal defendant a fundamental right to be clearly informed of the nature and cause of the charges in order to permit adequate preparation of a defense. [Footnote omitted.] See Cole v. Arkansas, 333 U.S. 196, 68 S.Ct. 514, 92 L.Ed. 644 (1948); see also Gray v. Raines, 662 F.2d 569, 571 (9th Cir.1981) ("A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense--a right to his day in court--are basic in our system of jurisprudence. . . ." (quoting In re Oliver, 333 U.S. 257, 273, 68 S.Ct. 499, 507, 92 L.Ed. 682 (1948))).

---

[4] Griffin explained that Yates v. United States, 354 U.S. 298, 311-12 (1957) "was the first and only case . . . [to] apply Stromberg to a general verdict in which one of the possible bases of conviction did not violate any provision of the Constitution but was simply legally inadequate (because of a statutory time bar). As we have described, that was an unexplained extension, explicitly invoking neither the Due Process Clause (which is an unlikely basis) nor [the court's] supervisory powers over the procedures employed in a federal prosecution." Griffin, 502 U.S. at 56. Thus, Yates is similarly inapplicable here.

Sheppard v. Rees, 909 F.2d 1234, 1236 (9th Cir. 1990). However, constitutionally adequate notice may be provided to a defendant by means other than the charging document. Morrison v. Estelle, 981 F.2d 425, 427 (9th Cir.1992), cert. denied, 508 U.S. 920 (1993), citing Sheppard, 909 F.2d at 1236 n.2.

The Morrison court distinguished Sheppard, characterizing it as a "narrow ruling," and noting that California courts have limited the application of Sheppard strictly to its facts. See Morrison, 981 F.2d at 428. In Sheppard, the court found the prosecution ambushed the defense with a new theory of culpability after both sides had rested and after jury instructions were settled. The Morrison court held that constitutionally adequate notice had been provided the defendant by the two days he had to prepare a closing argument after the initial instructions conference, and, as an independent ground, by evidence of the underlying felony presented at trial. See id.

Here, petitioner was charged with one count of first degree murder and one count of arson in violation of Cal. Penal Code § 451(a). (CT 1-2.) Specifically, the charge stated that on February 7, 1992, petitioner "did willfully, unlawfully, and maliciously set fire to and burn and cause to be burned an inhabited structure, thereby causing great bodily injury and death to Jack Clark." (CT 1-2.)

After the prosecution rested, the prosecutor sought to amend the information to reflect that the victim had been stabbed to death before the fire was set to his residence. On January 29, 1993, during a conference on jury instructions, the trial court agreed to the amendment, and the arson charge was amended to a violation of Cal. Penal Code § 451(b), deleting the reference to great bodily injury. (RT 822-25.) Closing arguments began on February 2, 1993, four days later.

California Penal Code § 451 reads, in pertinent part:

> A person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned or who aids,

/////

> counsels, or procures the burning of, any structure, forest land, or property.
>
> (a) Arson that causes great bodily injury is a felony punishable by imprisonment in the state prison for five, seven, or nine years.
>
> (b) Arson that causes an inhabited structure or inhabited property to burn is a felony punishable by imprisonment in the state prison for three, five, or eight years.

Id.

Thus, under the statute, petitioner was charged with the substantive act of arson. (See RT 823.) The amendment to change what was burned did not amend the substantive act of arson. (See RT 824.) Petitioner was not ambushed with the arson charge. Petitioner was put on notice in the information that he was charged with arson, that he "willfully, unlawfully and maliciously set fire to and burn and cause to be burned an inhabited structure, thereby causing great bodily injury." (CT 1-2.) This language put petitioner on notice that he was charged with arson of an inhabited structure, even though he was specifically charged with Cal. Penal Code § 451(a) rather than § 451(b).

The instant case is analogous to Morrison rather than Sheppard. Petitioner's counsel had four days to amend closing argument to address the fact he was no longer being charged with arson causing great bodily injury. California law provides for the same jury instruction whether the defendant is charged with Cal. Penal Code 451(a) or 451(b). See CALJIC 14.80.[5] Accordingly, petitioner was not deprived of due process by the amendment to

---

[5] "[Defendant is accused [in Count[s] ] of having committed the crime of arson which caused [great bodily injury to another] [[a] [an] [inhabited] [structure] [property] [forest land] to burn], a violation of section 451, subdivision [(a)][(b)][(c)][(d)] of the Penal Code.]
Any person who [willfully and maliciously [sets fire to] [or] [burns] [or] [causes to be burned]] [or] [[aids] [counsels] [procures] the burning of] any [structure] [forest land] [property] and by so doing causes [great bodily injury] [or] [[a] [an] [inhabited] [structure] [or] [property] [forest land] to burn] is guilty of arson in violation of Penal Code section 451, subdivision [(a)][(b)][(c)][(d)].
[The term "great bodily injury," as used in this instruction, means a significant or substantial physical injury.]
[The word "willfully" means intentionally. The word "maliciously" means with a wish to vex, [defraud,] annoy or injure another person, or with an intent to do a wrongful act.]

the arson charge. See Morrison, 981 F.2d at 428-29 (evidence presented during trial gave petitioner adequate notice of felony-murder theory on which instructions sought two days before closing argument.) Petitioner's second claim for relief should be denied.

C. Third Claim

Petitioner's third claim is that he was denied due process under the Fifth and Fourteenth Amendments to the Constitution when the prosecution was permitted to change the murder charges against petitioner after the government rested its case.

Under the Sixth Amendment, "a criminal defendant [has] a fundamental right to be clearly informed of the nature and cause of the charges in order to permit adequate preparation of a defense." Sheppard, 909 F.2d at 1236. However, constitutionally adequate notice of a felony-murder charge may be provided to a defendant by means other than the charging document. Morrison, 981 F.2d at 427, citing Sheppard, 909 F.2d at 1236 n.2. Defendants charged with first degree murder may receive adequate notice of a prosecutor's felony-murder theory from the trial. Murtishaw v. Woodford, 255 F.3d 926, 953-54 (9th Cir. 2001.)

The information in the instant case charged petitioner as follows: petitioner "did willfully, unlawfully, and with malice aforethought murder Jack Clark, a human being." (CT 1.) Under California law, both malice-murder and felony-murder lead to the single crime of murder. People v. Gallego, 52 Cal. 3d 115, 188-89 (1990).

During trial, evidence was adduced that the victim had been robbed or burglarized as his microwave, car and perhaps some cash had been stolen. Sufficient evidence was presented to put petitioner on notice that the prosecution intended to pursue felony murder based on robbery or burglary.

---

In order to prove this crime, each of the following elements must be proved:
1 A person [set fire to] [or] [burned] [or] [caused to be burned] [or] [[aided] [counseled] [procured] the burning of] a [structure] [forest land] [property]; [and]
2 The [fire was set] [or] [burning was done] willfully and maliciously [.] [; and
3 The fire caused [great bodily injury to another] [a] [an] [inhabited] [structure] [property] to burn]." Id.

In addition, after the defense had presented five witnesses, the court held a conference on jury instructions on January 29, 1993. There was discussion about general and specific intent crimes. (RT 806-809.) The prosecution confirmed she would be seeking murder in the first degree. (RT 809.) The prosecution agreed that a second degree murder instruction should be given. (RT 811.) The prosecution suggested the introductory language of "the crime of First Degree of premeditated and deliberated First Degree murder, robbery, and burglary require specific intent." (RT 812.) She noted that the felony murder rule does not require specific intent. (RT 812.) When asked whether she planned to pursue a premeditated murder theory, the prosecution responded, "Well, certainly the easier theory is the felony murder rule." (RT 813.) But she confirmed that she would argue there was evidence to support premeditated murder as well. (RT 813.) The court then noted she would have to edit the proposed jury instructions to meet the two different theories the prosecution intended to pursue. (RT 813.) Thus, petitioner was specifically put on notice on January 29, 1993 that the prosecution would be seeking felony murder as well as first degree murder. Closing arguments did not begin until February 2, 1993, so petitioner's counsel had four days to prepare closing argument.

Given these facts, petitioner was provided sufficient notice under Morrison. See Morrison, 981 F.2d at 428-29. Accordingly, petitioner's third claim for relief should be denied.

D. Fourth Claim

Petitioner's fourth claim is that his conviction and consecutive sentence for arson were violations of double jeopardy, in violation of the Fifth and Fourteenth Amendments to the Constitution.

The Double Jeopardy Clause of the Fifth Amendment to the Constitution provides that no person shall "be subject for the same offence to be twice put in jeopardy of life." The Clause applies to the states under the Fourteenth Amendment. Benton v. Maryland, 395 U.S. 784 (1969). The double jeopardy clause prevents multiple trials on the same charge,

/////

United States v. DiFrencesco, 449 U.S. 117 (1980), and multiple punishments for the same offense. United States v. Arrelano-Rios, 799 F.2d 520 (9th Cir. 1986).

Here, petitioner did not receive multiple punishments for the same offense or undergo multiple trials on the same charge. Petitioner was not found not guilty of Cal. Penal Code § 451. Rather, the prosecution moved to amend the charge to conform the charges to the proof at trial, that the victim was dead by the time the fire was set. The underlying elements of arson were still at issue. The motivation for the Double Jeopardy Clause is that "the state, with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity, as well as enhancing the possibility that even though innocent he may be found guilty." Green v. United States, 355 U.S. 184, 187-88 (1957). There is no double jeopardy or due process violation under the facts of this case, where the prosecution was allowed to amend the arson charge during the trial to reflect the proof that the victim was dead when the fire was set.

Moreover, as respondent points out, the elements of first degree murder and arson are "completely distinct and one crime is not a lesser-included offense of the other." (Answer at 17.) Separate crimes constitute the same offense for double jeopardy purposes if they contain identical elements or if one offense is a lesser-included offense of the other. See Blockburger v. United States, 284 U.S. 299, 304 (1932)("where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.") Because the crimes of murder and arson do not constitute the same offense, multiple punishments do not violate the Double Jeopardy Clause.

In addition, the evidence showed that petitioner and his accomplice left the scene of the murder in the victim's car and only returned a few hours later to burn down the house to

/////

destroy evidence that might implicate them. This separation in time and purpose represents a completely different crime, not a continuous course of criminal conduct for purposes of double jeopardy. Thus, petitioner's separate conviction and sentence for arson does not constitute double jeopardy. Petitioner's fourth claim for relief should be denied.

E. Fifth Claim

Petitioner's fifth claim is that he was denied due process under the Fifth and Fourteenth Amendments to the Constitution when the jury convicted him of arson causing an inhabited structure to burn, when the evidence showed that the burned structure was not inhabited at the time of the fire. Petitioner argues that under California law, the burning of a structure containing a corpse does not violate Cal. Penal Code § 451(b) because a dead body cannot inhabit a structure. See Cal. Penal Code § 450(d). Petitioner contends that a dwelling is not inhabited if the occupant is already dead inside the structure. People v. Ramos, 52 Cal.App.4th 300, 302 (1997).[6] [7]

Respondent argues that the jury could have concluded that the residence was inhabited based on the evidence that the new owner was remodeling the residence and intended to move in shortly. (RT 284-85.) Bob Odom, the new owner, had presented the victim with an eviction notice on January 7 and testified that the victim was to have moved out by February 6, the date the victim was murdered. (RT 285.)

Respondent also argues that Ramos is distinguishable because it did not involve interpretation of Cal. Penal Code § 451(b) and because the occupant of the residence in Ramos had died from natural causes. Ramos, 52 Cal.App.4th at 301. Respondent contends that "based on the penalties prescribed in the arson statutes, it is clear that the legislative intent was to

[6] "To put it plainly, a dead body is not using a house for a 'dwelling' and there is no way to say that a dead man is going to return or that he has [an intent to occupy]." Id.

[7] Although Ramos was convicted of burglary, both the burglary and arson statutes use the same definition of "inhabited." Cal. Penal Code § 450(d).

impose the stiffest punishment on arsonists who inflict or risk injury to others," and such intent would be "thwarted if a person who burns a building that is temporarily unoccupied is eligible for a greater sentence than a person who kills the inhabitant before setting the fire." (Answer at 20.)

When a challenge is brought alleging insufficient evidence, federal habeas corpus relief is available only if it is found that upon the record evidence adduced at trial, viewed in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 324 (1979). Under Jackson, this standard must be applied with reference to the substantive elements of the criminal offense as defined by state law. Id., 443 U.S. at 324 n.16.

Petitioner was convicted of violating Cal. Penal Code § 451(b), which states: "Arson that causes an inhabited structure or inhabited property to burn is a felony punishable by imprisonment in the state prison for three, five, or eight years." (Id.) The term "inhabited" is defined as "currently being used for dwelling purposes whether occupied or not." Cal. Penal Code § 450(d). Under California law, inhabitation is an element of the crime of arson under Cal. Penal Code § 451(b). It was the prosecution's burden to prove beyond a reasonable doubt the house was inhabited at the time of the fire. People v. Jones, 199 Cal.App.3d 543, 549, 245 Cal.Rptr. 85 (Cal.App.2.Dist. 1988).[8]

In the instant case, it was undisputed that the victim was dead at the time the fire was set. The prosecution sought to amend the charges based on that fact.

> In Jones, the court expressly rejected the prosecution's argument that it was unnecessary someone be making use of the structure as a dwelling at the time of the fire so long as the purpose of the structure is to

---

[8] Jones was convicted of setting fire to an inhabited structure, pursuant to Cal. Penal Code § 451(b), for burning the house from which he and several cotenants had been evicted the day before. Jones, 199 Cal.App.3d at 543. Jones' conviction for arson of an inhabited structure was modified to arson of a structure, Cal. Penal Code § 451(c) because the evidence did not support a finding that any of the tenants intended to continue using the house as a dwelling place. Jones, 199 Cal.App.3d at 549.

> serve as a dwelling. This interpretation would lead to results that are logically unacceptable and inconsistent with legislative intent. Under the People's argument, if the owner-occupant of a house died, the house would be "inhabited" by a dead person. Id., at 547.

After reviewing the history of the arson statute, the Jones court concluded that "the requirement the structure be 'currently used' for dwelling purposes requires the People to prove at least one of the evicted tenants intended to continue living in the house after the eviction. Id., at 548. The court went on to analogize to the statutory language governing burglary, Cal. Penal Code § 459, comparing two cases involving tenants who had moved out. Jones, 199 Cal.App.3d at 548.[9]

> "Where . . . the residents have moved out without the intent to return, the house becomes uninhabited, i.e., it is no longer being used for dwelling purposes." [Citation omitted.] On the other hand, in Guthrie, the house was held to be inhabited even though the tenants had left for an indefinite period. The evidence showed the tenants intended to return to the house after they recovered from the shock of a murder that occurred there. . . . "[A] residence is still 'inhabited' . . . even though the residents of the house are temporarily away from the premises, where they have indicated no intention to stop living there." [Citation omitted.] Thus, we conclude it is the present intent to use the house as a dwelling which is determinative.

Id.

Thus, in the instant case, the prosecution was required to adduce evidence that "someone had the present intent to use the house as a dwelling at the time of the fire." Id. Because the victim was already dead at the time the fire was started, the prosecution could not prove that Mr. Clark had the present intent to use the house as a dwelling or that Mr. Clark was "temporarily absent." Therefore, petitioner could not be found guilty of a violation of Cal. Penal Code § 451(b).

/////

---

[9] The Jones court compared People v. Cardona, 142 Cal.App.3d 481, 484 (1983) to People v. Guthrie, 144 Cal.App.3d 832, 838 (1983). In deciding whether burglary to an inhabited structure had occurred, each court held that "whether or not the structure was 'inhabited' depended on the intent of the tenants to continue living there." Jones, 199 Cal.App.3d at 548.

There is some evidence that the new owner intended to move into the dwelling.[10] However, the fact that the victim was still residing in the dwelling on February 6,[11] the date of the murder, demonstrates that the victim had not yet been evicted or had not completely moved out such that the court could consider the new owner as inhabiting the dwelling but temporarily out of occupancy.

Accordingly, petitioner's conviction for arson of an inhabited structure or property violated petitioner's due process rights and must be set aside. Petitioner's fifth claim for relief should be granted.

Respondent asks that if the court finds petitioner was improperly convicted under Cal. Penal Code § 451(b), the evidence demonstrates petitioner was culpable of the lesser crime of arson of an uninhabited structure, in violation of Cal. Penal Code § 451(c),[12] and "the trial court should be given an opportunity to fashion a remedy to reflect petitioner's proven culpability." (Answer at 20.) .

F. Sixth Claim

Petitioner's sixth claim is that he was denied due process and a fair trial under the Fifth and Fourteenth Amendments to the Constitution by improper actions of the prosecution in his case.

/////

---

[10] Mr. Odom testified that the contract specified he was to "rehab the house and refix it within six months." (RT 286.) Later, the following exchange took place during cross-examination:

Q: And you were gonna finish rehabing the place and either move into it or –
A: That's right, yes.
Q: – or sell it?

(RT 295.)

[11] The victim was clothed in a T-Shirt and white underwear (RT 164), there were dishes and food in the kitchen (RT 169-70), and a burned out mattress and boxsprings in the northeast bedroom. (RT 174.)

[12] Section 451(c) states: "Arson of a structure or forest land is a felony punishable by imprisonment in the state prison for two, four, or six years."

Federal habeas review of prosecutorial misconduct is limited to the issue of whether the conduct violated due process. See Darden v. Wainwright, 477 U.S. 168, 181 (1986); Sassounian v. Roe, 230 F.3d 1097, 1106 (9th Cir. 2000). Prosecutorial misconduct violates due process when it has a "substantial and injurious effect or influence in determining the jury's verdict." See Ortiz-Sandoval v. Gomez, 81 F.3d 891, 899 (9th Cir. 1996) (quoting O'Neal v. McAninch, 513 U.S. 432, 443 (1995)). A claimant must show "first that the prosecution engaged in improper conduct and second that it was more probable than not that the prosecutor's conduct 'materially affected the fairness of the trial.'" United States v. Smith, 893 F.2d 1573, 1583 (9th Cir. 1990) (quoting United States v. Polizzi, 801 F.2d 1543, 1558 (9th Cir. 1986)). If left with "grave doubt" whether the error had substantial influence over the verdict, a court must grant collateral relief. Brecht v. Abrahamson, 507 U.S. 619, 631 (1993); Ortiz-Sandoval, 81 F.3d at 899.

In order to determine whether the prosecutor engaged in misconduct during his closing argument to the jury, it is necessary to examine the entire proceedings and place the prosecutor's remarks in context. See Greer v. Miller, 483 U.S. 756, 765-66 (1987). In fashioning closing arguments, prosecutors are allowed "reasonably wide latitude," United States v. Birges, 723 F.2d 666, 671-72 (9th Cir. 1984), and are free to argue "reasonable inferences from the evidence." United States v. Gray, 876 F.2d 1411, 1417 (9th Cir. 1989). See also Duckett v. Godinez, 67 F.3d 734, 742 (9th Cir. 1995). "[Prosecutors] may strike 'hard blows,' based upon the testimony and its inferences, although they may not, of course, employ argument which could be fairly characterized as foul or unfair." United States v. Gorostiza, 468 F.2d 915, 916 (9th Cir. 1972).

a. Petitioner's Alleged Statement About His Potential Sentence

Petitioner contends that the prosecution committed misconduct by making numerous references to an alleged statement by petitioner about his potential sentence that was

/////

calculated to mislead the jury. (Supp. Trav. at 13.) Respondent argues that the prosecution properly elicited the evidence and properly referred to it in closing argument. (Answer at 21.)

On direct examination, Cynthia Douglas repeatedly denied telling Detective Thurston that petitioner said he thought he was going to go to prison for 25 years to life. (RT 387-88, 390-91, 395-96.) Cynthia Douglas denied making the phone call to Detective Thurston. (RT 388.) Cynthia did recall being interviewed by a "real tall" police officer in the bathroom of her residence. (RT 389.)

On April 9, 1992, Detective Thursten met with Cynthia Douglas in her bathroom. (RT 854.) Around 10:30 p.m. that evening, Detective Thurston testified that Cynthia Douglas called him. (RT 854.) Detective Thurston testified that Cynthia told him that three or four days earlier, petitioner "had told her he was going to go to prison for twenty-five years to life." (RT 647-49.) Thurston testified it sounded as if Cynthia had been drinking. (RT 647-48; 854-55.)

Detective Thurston testified that Cynthia made the statement before he could set up the tape recorder. (RT 852.) Defense counsel played the tape for the jury, attempting to show Cynthia did not make the statement. (RT 853.) On the tape, Cynthia also denied having previously told Thurston that petitioner told her he was facing a prison term of 25 years to life. (RT 858.)

The trial court refused to allow defense counsel to question Cynthia further to elicit her understanding that by the alleged statement, petitioner meant he was innocent but would not be able to get a fair trial. (RT 427.) The prosecution objected, arguing such clarification was based on self-serving hearsay, as Cynthia's understanding was clarified by a later conversation Cynthia had with petitioner from the jail. (RT 427-28.) The trial court based the denial on the fact that Cynthia had repeatedly denied making the statement, so there was nothing to clarify, and any later statement made by petitioner about his innocence was inadmissible hearsay. (RT 428.)

/////

When petitioner took the stand, he also denied making such a statement. (RT 966.)

The prosecution referred to this alleged statement in closing argument on two separate occasions, arguing the alleged statement supplied substantive evidence of petitioner's consciousness of guilt and was an inconsistent statement impeaching Cynthia's credibility. (RT 1053-55; 1083-87.)

> In other words, Cynthia comes in and she says she didn't say that. Detective Thurston says she did. You've got the tape. You – you know what the tape said, and I'll discuss that with you more in detail. But if you believe that she did say that, then she's made an inconsistent statement in court, and it's not a fairly material part of this case. You are allowed to use that to decide whether you believe she's a credible witness, a believable witness, whether you should believe what she tells you about that or the other things that she testified about. So you can use that as a kind of a bench mark of a standard to decide believability.
>
> Another way and perhaps an even more important way to use that, and that is as substantive evidence. The Judge read this instruction to you a few minutes ago, and as I said, it's somewhat difficult to grasp the first time you hear it and it may not have sunk in. That means that if you believe that the [petitioner] told Cynthia Douglas that he was gonna go to prison for twenty-five years to life and you believe that Cynthia told that to Detective Thurston, then you can consider that as substantive evidence that he said that, and that he had a consciousness of guilt that he thought he was going to go to prison for twenty-five years to life. So you can consider that as being true as his having said that and – and consider that and weigh that in the evidence that you'll be weighing in this case. And you can also consider it as evidence of Cynthia's credibility. So those are the two ways that you can consider inconsistent statements.

(RT 1054-55.) The prosecution further argued that certain tape-recorded portions of the conversation demonstrated that Cynthia appeared to have initially confirmed petitioner had referenced a potential prison sentence before going on to deny she had previously said petitioner made the statement. (RT 1085.)[13]

/////

---

[13] The prosecution reminded the jury that they were the sole judges of what was actually said on the tape. (RT 1084.)

> Detective Thurston says . . . before I was out there to talk to you, he said he was going to go to jail for twenty-five years to life, is that what you said? And then she says yeah. And Thurston says why did he tell you that? And she says I don't know. . . . I think he was scared, and I think – and doesn't quite finish the thought.
>
> And they go on to say why he was scared, and did he know that he was looking for them? And Detective Thurston says well, then why did he think he was going to go to prison twenty-five to life? Did he tell you? In other words, tell you why he thought he was going to prison for twenty-five to life?
>
> And she said no he didn't say it like that. I don't even know that – what is going on with him. At that . . . point she's not denying that he said this. She's talking about what the meaning of it was, what significance she attached to it and whether she really thought in her own mind whether her brother was capable of murder. She's not denying that she told this to Detective Thurston.
>
> . . . .
>
> By the time he gets to the end of the . . . conversation with her, she's denying she even said this to him.

(RT 1085-86.) The jury was instructed that statements made by the attorneys at trial are not evidence. (RT 1031.)

This record does not demonstrate prosecutorial misconduct. The argument was fair comment on the evidence presented. The prosecution made it clear that it was up to the jury to decide who was credible and how to use the alleged statement. A reasonable inference could be drawn that Cynthia initially told Detective Thurston about the alleged statement, then reversed course when she realized the statement incriminated petitioner. Both Detective Thurston's testimony and the taped conversation supported such an inference. Accordingly, the prosecution's use of this evidence does not constitute prosecutorial misconduct. See Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000)(prosecutor's arguments supported by the evidence and reasonable inferences drawn therefrom).

b. Character Evidence

Petitioner also argues that the prosecution introduced and attempted to introduce impermissible and prejudicial evidence of petitioner's character, including testimony suggesting

petitioner had a heroin problem (RT 499-500), and that a government witness feared petitioner would hurt him and his family (RT 525).[14]

The record reflects that petitioner's brother, Johnny Douglas, testified as to his own problems with heroin, and testified that other members of his family had problems with heroin. (RT 499-500.) Defense counsel objected on the grounds that the prosecutor was eliciting improper character evidence and that the last question was vague as to which members of the family had problems with heroin. (RT 500.) The objection was sustained and, after a sidebar conference, the prosecutor began a different line of questioning. (RT 500.) Even assuming, arguendo, that the question was improper, the trial court sustained the objection and petitioner was not directly implicated by the vague response or by further questions. Prompt and effective action by the trial court may neutralize the damage by admonition to counsel or by appropriate curative instructions to the jury. See, e.g. United States v. Freter, 31 F.3d 783, 787 (9th Cir. 1994); United States v. Mikka, 586 F.2d 152, 156 (9th Cir.1978).

In addition, petitioner argues that the prosecution improperly elicited testimony from Johnny Douglas that he feared petitioner would hurt Johnny and his family. (Supp. Traverse at 14.)

The record reflects that the prosecution asked Johnny why he immediately reported the murder and burglary to a police officer and Johnny responded: "I was fearful for my life and life's safety, and my wife's safety and my children – my children at the time." (RT 525.) Johnny did not expressly attribute his fear to petitioner, although that was one inference the jury might have made. The prosecution made no further attempt to suggest petitioner was the source of Johnny's fear. Accordingly, this claim must also fail.

/////

---

[14] Petitioner withdrew his reference to petitioner's prior conviction for voluntary manslaughter and arrest for spousal abuse as that evidence involved Johnny Douglas, petitioner's brother. (Supp. Traverse, at 14, n.10.)

c. Changing the Charges

Petitioner argues that the prosecutor changed the charges against petitioner after the evidence showed petitioner was not guilty of the charged offense of arson pursuant to Cal. Penal Code § 451(a). However, as noted in the section addressing petitioner's second claim above, the prosecution moved to amend the charges to reflect that the victim had died prior to the setting of the fire. In light of the evidence that the victim was dead before the fire, it would have been misconduct for the prosecution to argue that the arson had inflicted great bodily injury on the victim. The prosecution's motion to amend the charges was not misconduct. Accordingly, this claim must also fail.

d. Videotape of the Victim

Petitioner argues that he suffered prosecutorial misconduct when the prosecution showed a gruesome videotape of the victim over objection (and despite an offer to stipulate) for no other purpose but to inflame the passions of the jury. (Second Am. Pet. at 6.)

Defense counsel objected to the playing of the videotape as gruesome and offered to stipulate to the identity of the victim, which he argued would "eliminate the necessity of showing any of the[] photographs or video tapes to the jury." (RT 40-41.) The trial court previewed the videotape and heard argument from the prosecution and defense counsel as to whether the videotape should be shown to the jury. (RT 93-101.) The prosecution explained the videotape was necessary to prove malice aforethought, premeditation, and other state of mind issues, the number of and location of stab wounds. (RT 100-101.) The trial court concluded:

> Well, they're not pleasant things to look at, I don't feel that they're of such a nature that – that they're going to inflame the jury or bring about revelation on the jury. We've explored with the jury on voir dire the fact that there may be some – some photographic evidence in this case to see if they're sensitive to that. So I think they're . . . all aware that something of this nature may be shown to them.
>
> Quite frankly, I don't find it of that nature. I don't mean to say it's pleasant to look at, but I don't find it of such a nature that it's going to inflame the jurors as to this defendant, if rest of the

> evidence isn't to where he's prejudiced by it. So I'm going to allow it.

(RT 101.)

The prosecution's statements for seeking admission of the videotape were reasonable and do not demonstrate misconduct. In addition, the admission of this evidence did not violate petitioner's due process rights. The admission of evidence at trial may violate due process only if "there are no permissible inferences the jury may draw from the evidence." Jammal v. Van de Kamp, 926 F.2d 918, 920 (9th Cir. 1991). "The fact that evidence admitted as relevant by a court is shocking to the sensibilities of those in the courtroom cannot, for that reason alone, render its reception a violation of due process." Lisenba v. California, 314 U.S. 219, 228-29 (1941). Accordingly, this claim should also be denied.

G. Seventh Claim

Petitioner's seventh claim is that he was denied due process and a fair trial under the Fifth and Fourteenth Amendments to the Constitution when the trial judge unfairly limited the defense case by denying petitioner the right to introduce certain character evidence and by refusing to instruct the jury on voluntary manslaughter. Petitioner contends the exclusion of defense evidence also violated his Sixth Amendment right to present a defense. (Supp. Traverse at 15.)

As a general rule, evidentiary rulings by state courts do not raise federal constitutional issues. See Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). Federal habeas corpus relief is only available for evidentiary rulings so egregious that they amount to a violation of the Fourteenth Amendment's Due Process Clause. See Pulley v. Harris, 465 U.S. 37, 41 (1984). In order to violate the Due Process Clause the error must render the trial fundamentally unfair. Estelle, 502 U.S. at 72-73.

/////

/////

The Sixth Amendment grants to criminal defendants the right to present a defense, including the right to present evidence. Wood v. State of Alaska, 957 F.2d 1544, 1549 (9th Cir. 1992) (citing Michigan v. Lucas, 500 U.S. 145 (1991)).

> A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions. See Taylor v. Illinois, 484 U.S. 400, 410 (1988); Rock v. Arkansas, 483 U.S. 44, 55 (1987); Chambers v. Mississippi, 410 U.S. 284, 295 (1973). A defendant's interest in presenting such evidence may thus "'bow to accommodate other legitimate interests in the criminal trial process.'" Rock, supra, at 55 (quoting Chambers, supra, at 295); accord Michigan v. Lucas, 500 U.S. 145, 149 (1991). As a result, state and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." Rock, supra, at 56; accord Lucas, supra, at 151. Moreover, we have found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused. See Rock, supra, at 58 (other citations omitted).

United States v. Scheffer, 523 U.S. 303, 308 (1998).

In general, a challenge to jury instructions does not state a federal constitutional claim. See Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983). In order to warrant federal habeas relief, a challenged jury instruction "cannot be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due process right guaranteed by the fourteenth amendment." Prantil v. California, 843 F.2d 314, 317 (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)). To prevail on such a claim petitioner must demonstrate that the "ailing instruction . . . so infected the entire trial that the resulting conviction violates due process.'" Middleton v. McNeil, 541 U.S. 433, 437 (2004) (quoting Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp, 414 U.S. 147)). In making its determination, this court must evaluate the challenged jury instructions "'in the context of the overall charge to the jury as a component of the entire trial process.'" Prantil, 843 F. 2d at 317

(quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)). Where the challenge is to a refusal or failure to give an instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 155 (1977). See also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir. 1997).

An error in the giving of jury instructions is a "trial error" as distinct from a "structural defect." Arizona v. Fulminante, 499 U.S. 279, 309-10 (1991); Drayden v. White, 232 F.3d 704, 709 (9th Cir. 2000). A federal court may grant habeas relief based on trial error only when that error "'had substantial and injurious effect or influence in determining the jury's verdict.'" Brecht v. Abrahamson, 507 U.S. 619, 637 (1993) (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)). If a reviewing court is in "grave doubt" as to whether the error had such an effect, the petitioner is entitled to the writ. Coleman v. Calderon, 210 F.3d 1047, 1051 (9th Cir.2000).

A. Denial of Character Evidence

Petitioner contends the trial judge permitted the prosecution to introduce inadmissible character evidence about petitioner, but denied petitioner the opportunity to introduce admissible character evidence about the government's main witness.

i. Evidence of Violent Character

Specifically, petitioner contends the trial judge permitted the prosecution to imply that petitioner posed a danger to witnesses and was generally a dangerous person (RT 525), while denying the defense the opportunity to elicit testimony that Johnny Douglas was a violent person. (Supp. Traverse at 15.) The defense theory at trial was that Johnny Douglas committed the murder; Johnny Douglas was the prosecution's key witness against petitioner. Petitioner did not cite a specific instance where the defense was denied the opportunity to elicit testimony that Johnny was a violent person.

/////

Johnny Douglas testified that he reported petitioner to the police because Johnny was "fearful for [his] life and . . . wife's safety and [his] . . . child at the time." (RT 525; see also 542, 555-56.) On cross-examination, Johnny Douglas confirmed he had been convicted of "killing a man for voluntary manslaughter," (RT 531), and robbery (RT 531), that he had been arrested many times (RT 531, 533), and Johnny was using heroin in February of 1992 (RT 535).

During direct examination of petitioner's mother, June Douglas, the prosecution objected to defense counsel's efforts to inquire into Johnny Douglas' reputation as a peaceful or violent person either in the community or in June's opinion. (RT 764.) The trial court sustained the objection, ruling that Johnny Douglas was not a victim, just a witness, so his character for violence was not at issue in this case. (RT 764.)

That ruling was not erroneous. Moreover, other evidence was adduced that raised an inference that Johnny had violent tendencies. For example, defense counsel was able to suggest by cross-examination that Johnny committed the instant crimes. (RT 566.) In addition, the defense impeached Johnny by Cynthia Douglas' testimony that Johnny was not truthful, not honest and not sober. (RT 393.) The jury was informed of Johnny's criminal background, including his prior conviction for killing someone. Cynthia Douglas testified that Johnny threatened her, her mother, sister, boyfriend and brother in the hallway during the instant trial:

> He said that if I said anything to his wife or about his wife in court, that I should be scared to leave the building. And he threatened to beat up my boyfriend, who was sitting right next to me at the time. [¶] And then when my brother – other brother's walking down the hall, he confronted him and said does he want to fight him right there.

(RT 771.) On cross-examination, Cynthia also testified that Johnny's wife, Mayfa, was scared of Johnny. (RT 772.) June Douglas also testified that Johnny Douglas threatened the family if they testified against his wife. (RT 766.) Thus, the jury was made aware of Johnny's violent tendencies. On this record, the court cannot find that petitioner was deprived of his right to present a defense because he was not allowed to elicit testimony concerning Johnny Douglas'

violent tendencies. Petitioner has failed to explain what other evidence was wrongfully excluded. Review of the record does not reflect an error rising to the level of a constitutional violation.

ii. Admission of Uncorroborated Double-Hearsay Statement

In addition, petitioner contends the trial court permitted the prosecution to emphasize a prejudicial and uncorroborated double-hearsay statement allegedly made by petitioner, in a manner deliberately calculated to mislead the jury (RT 387-88, 648-49, 852, 1053-55, 1083-87), while precluding the witness from explaining the context of the statement. (RT 427-28). (Supp. Traverse at 15.)

As noted above, Cynthia Douglas repeatedly denied telling Detective Thurston that petitioner said he thought he was going to go to prison for 25 years to life. (RT 387-88, 390-91, 395-96.) Cynthia Douglas denied making the phone call to Detective Thurston. (RT 388.)

Detective Thurston testified that Cynthia Douglas called him and told him that "her brother . . . Gordon had told her that he was going to go to prison for twenty-five years to life." (RT 857.) Although that statement was made prior to the beginning of the tape-recording, the defense had the taped portion of the conversation played for the jury. (RT 852-54.) On the tape, Cynthia also denied having previously told Thurston that petitioner told her he was facing a prison term of 25 years to life. (RT 858.)

The trial court's refusal to allow Cynthia to explain her understanding of what petitioner meant by that statement was based on the fact Cynthia had repeatedly denied making the statement, so there was nothing to clarify, and any later statement made by petitioner about his innocence was inadmissible hearsay. (RT 428.) Petitioner also denied making the statement to anyone. (RT 966.)

Detective Thurston's testimony that Cynthia told him that petitioner told her that he was going to go to prison for twenty-five years to life was an uncorroborated, double-hearsay statement. But on habeas review, the only question before this court is whether the trial court

committed an error that rendered the trial so arbitrary and fundamentally unfair that it violated federal due process. Id. See also Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991) ("the issue for us, always, is whether the state proceedings satisfied due process; the presence or absence of a state law violation is largely beside the point"). Evidence violates due process only if "there are no permissible inferences the jury may draw from the evidence." Jammal, 926 F. 2d at 920. Even then, evidence must "be of such quality as necessarily prevents a fair trial." Id. (quoting Kealohapauole v. Shimoda, 800 F.2d 1463 (9th Cir. 1986)).

Here, the permissible inferences raised by the statement were consciousness of guilt and an inconsistent statement by Cynthia. The counter inference, that petitioner believed he would not get a fair trial, was explained to the jury by defense counsel in closing argument. Defense counsel was able to argue that because of petitioner's prior experience with the legal system and his prior prison time, any reference to the 25 years to life statement was a reflection of how he would be treated by the legal system rather than an admission of guilt. (RT 1152-53.) Counsel argued that petitioner knew "his brother . . . had fingered him" and "he thought he was doomed." (RT 1152.) Accordingly, this court cannot find that the erroneous admission of this statement violated due process or deprived petitioner of a fair trial. This claim should be denied.

B. Refusal to Instruct on Voluntary Manslaughter

Petitioner argues the trial judge refused to permit the jury to be instructed on voluntary manslaughter when there was evidence that petitioner had been drinking heavily that night, thus supporting the instruction.

The trial court's refusal to instruct the jury on the lesser included offense of voluntary manslaughter does not rise to the level of a constitutional error for which federal habeas relief is available. While it is clear that failure to instruct on a lesser included offense can constitute constitutional error in a capital case, see Beck v. Alabama, 447 U.S. 625, 638 (1980), "[t]here is no settled rule of law on whether [this principle] applies to noncapital cases." Turner

/////

v. Marshall, 63 F.3d 807, 819 (9th Cir.1995), overruled on other grounds by Tolbert v. Page, 182 F.3d 677, 685 (9th Cir.1999).[15]

Even if the Beck rule could be expanded to include a duty to instruct on lesser included offenses in non-capital cases, petitioner has not shown that the refusal to give the suggested jury instruction resulted in a fundamental miscarriage of justice in this case. In Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir. 1984)), the Court of Appeals for the Ninth Circuit held that failure to instruct on lesser included offenses does not generally present a federal constitutional question, but may do so in some cases because "the criminal defendant is also entitled to adequate instructions on his or her theory of defense." Id., 730 F. 2d at 1240. See also United States v. Mason, 902 F.2d 1434, 1438 (9th Cir.1990) ("A defendant is entitled to have the judge instruct the jury on his theory of defense, provided that it is supported by law and has some foundation in the evidence."). In Bashor, however, the court found no fundamental unfairness in the trial court's failure to instruct on a lesser included offense to a homicide charge because Bashor's counsel did not request the lesser included offense instruction and the defense strategy was based on a theory that was inconsistent with the instruction. Id., 730 F.2d at 1240.

Here, the defense theory was not voluntary manslaughter, but that two other people perpetrated the crimes: Gloria Thomas and Johnny Douglas. During an initial conference on jury instructions after the prosecution rested its case, defense counsel stated he intended to seek an instruction on voluntary manslaughter based on the large number of wounds to the victim. (RT 810.) Defense counsel argued this demonstrated the killing was done in a heat of passion, "some kind of a frenzied kind of state of mind." (RT 810.) The prosecution argued there were no facts to support a voluntary manslaughter defense. (RT 810.) The trial court

/////

---

[15] The Ninth Circuit, like other circuits, has declined to extend Beck to find constitutional error arising from the failure to instruct on a lesser included offense in a non-capital case. See Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir.1998); Turner, 63 F.3d at 819 (citing Bashor v. Risley, 730 F.2d 1228, 1240 (9th Cir.1984)).

agreed that there wasn't any evidence "up to now," but noted the defense was getting ready to put on evidence. (RT 811.)

Petitioner argues that there was evidence that petitioner had been drinking on the night of the murder (RT 811) and therefore defense counsel's request for voluntary manslaughter instruction should have been granted. However, at the time defense counsel requested the voluntary manslaughter instruction, there was no evidence concerning petitioner's drinking alcohol on the night of the murder because petitioner had not decided to take the stand. Moreover, the defense at that time did not plan to pursue an intoxication defense either:

> MR. SMITH: It seems that . . . the condition of the body indicates that whoever did this was in a frenzied state of mind which my argument would support and inference of heat of passion unless – unless Mr. Douglas decides to take the stand and say that he did and was drunk at the time, but don't expect to happen. There isn't any other theory than that, but I think it is sufficient to justify an instruction.
>
> MS. HAYES: Voluntary intoxication after the sale and other cases is no longer possible to [reduce] a murder to a voluntary manslaughter through voluntary intoxication.
>
> MR. SMITH: As I say, I don't expect [petitioner] to testify that he did this, so – . . . that's moot point. I think there's enough in the record to at least arguably justify a voluntary manslaughter.
>
> THE COURT: Okay. Well, at this point the Court feels the People are correct that there isn't any evidence that up to now – and again I realize that defense is going to be putting on evidence on Monday, but at this time there's no call for voluntary manslaughter instruction.

(RT 810-11.)

Once petitioner took the stand, he continued to deny involvement in the crime.[16] Defense counsel did not request the voluntary manslaughter instruction again (RT 1024-30), even

---

[16] Petitioner did testify to drinking that night, his testimony concerning his alcohol consumption. (For example, RT 908: bought 1-2 cans of alcohol each time he went to the store; RT 908: can't recall number of times he went to the store; RT 909: went to the store less than ten times; RT 916: pitched in $15 - $20 for alcohol, went to store more than 5 times, but less than 10 times); RT 918: went to store two to three times; RT 963: about 12:45 he and James went to the store to get a bottle of gin; he had a few drinks out of the gin bottle.)

after petitioner took the stand and testified in his own defense. (RT 894-978.) Thus, like the defendant in Bashor, petitioner was not prevented from presenting his theory of defense by virtue of the trial court's initial refusal to give the voluntary manslaughter instruction.[17] See also Duvall v. Reynolds, 139 F.3d 768, 786-87 (10th Cir. 1998)(evidence did not warrant instruction on lesser included offense of manslaughter where no evidence showed Duvall acted in heat of passion). In addition, the trial court did instruct the jury on the lesser-included offense of second degree murder. (CT 79-83.) Accordingly, this claim should also be denied.

H. Eighth Claim

Petitioner abandoned this claim. (March 7, 2005 Supplemental Traverse at 16.)

I. Ninth Claim

Petitioner's ninth claim is that he received ineffective assistance from trial counsel that prejudiced petitioner pretrial, at trial and after trial in petitioner's attempts to obtain direct and collateral review in the California courts, in violation of the Sixth and Fourteenth Amendments to the Constitution.[18]

There is no reasoned opinion by a state court addressing the ineffective assistance of counsel claims contained in the amended petition.

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in

---

[17] California law requires a trial court to instruct sua sponte on a lesser included offense "if the defendant proffers evidence enough to deserve consideration by the jury, i.e., 'evidence from which a jury composed of reasonable men could have concluded' that . . . the requisite criminal intent" was not present for the charged offense. People v. Ramirez, 50 Cal.3d 1158, 1180 (1990), cert. denied, 498 U.S. 1110 (1991) (quoting People v. Flannel, 25 Cal.3d 668, 684 (1979)). The court has no duty to instruct sua sponte on a lesser offense, however, if it appears that the defendant is not relying on the defense or if the defense is inconsistent with the defendant's theory of the case. People v. Sedeno, 10 Cal.3d 703, 716 (1974).

[18] Petitioner's ineffective assistance of counsel claim that trial counsel failed to provide discovery and all evidence relevant to petitioner's decision to accept or reject the plea offer was denied and that denial was subsequently affirmed by the Ninth Circuit Court of Appeals. Douglas v. S. Cambra, 40 Fed. Appx. 356 (9th Cir. 2002), vacated on other grounds by Douglas v. Cambra, 102 Fed.Appx. 595 (9th Cir. 2004). (Docket No. 38.)

Strickland v. Washington, 466 U.S. 668 (1984). To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Id. at 687-88. After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003). Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. Strickland, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id. See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).

Petitioner cites multiple instances of defense counsel’s errors.

a. Witnesses

Petitioner contends that defense counsel failed to locate, interview or call defense witnesses. At the January 29, 1993 Marsden[19] hearing, petitioner stated he believed defense counsel should call James Russell Talarico[20] and Andrew Gates to testify they witnessed petitioner purchase a microwave on the street sometime between 10:00 p.m. and midnight on the night the victim was murdered. (RT 778-84.) Petitioner argued this evidence would demonstrate he did not steal a microwave from the victim’s residence. (Id.) Petitioner also argued that

---

[19] Petitioner had moved for substitution of counsel pursuant to People v. Marsden, 2 Cal. 3d 118 (1970). Four Marsden hearings were held. The court was not provided with the transcript from the first hearing held August 17, 1992, five months prior to trial. Neither party has cited that hearing at issue here. Accordingly, the failure of the court to consider the August 17, 1992, hearing transcript is not material. The transcript from the other three Marsden hearings was lodged on January 27, 1999.

[20] Talarico was a neighbor of the victim and had already testified as a prosecution witness. (RT 297-312.)

defense counsel should call neighbor Doris Sander, who "might have heard something to the effect of any intruders throughout the night," (RT 788), neighbor Darleen Louise Inmen, to testify that petitioner "never once approached her with any stolen goods" (RT 788-89), neighbors Garcia Henry and Rhonda Henry who would testify that "[t]here was commotion in the neighborhood certain times," (RT 791), and neighbor Paul Weiner who would testify that "maybe he's seen the color of the car that he was driving . . . on [the] occasion that [petitioner] had went over there to visit Darlene." (RT 791.)

Petitioner contended that James Talarico was of vital importance because he would testify that he saw petitioner purchase a microwave oven. (RT 781.) Defense counsel stated that he could not verify that. (RT 781; 783.) Petitioner advised the court that Talarico would testify he was on the street in front of petitioner's sister's house and purchased a microwave between the hours of 10 p.m. and midnight. (RT 783.) Defense counsel stated he would have Talarico re-interviewed over the weekend "just in case we missed something." (RT 784.) As to Andrew Gates, defense counsel stated that he

> believed we've interviewed him. I don't have all my investigator's notes. But I'm pretty sure that's a person who we contacted.
> . . .
> We've spent a fair amount of time trying to track down or investigate the business about the purchase of the microwave. I can't tell you off the top of my head exactly who was contacted or when. But I know a great deal of effort has been expended on that aspect of things. And we haven't come up with anything.

(RT 784.) Petitioner confirmed to the trial court that Andrew Gates had been in touch with the defense investigator and that Gates was prepared to testify for petitioner. (RT 785.) Defense counsel reiterated that he could not verify that. (RT 785.) The trial court expressed its concern that if there were witnesses available to testify to having seen petitioner purchase the microwave on the street "that outweighs the time that he purchased it being in proximity to . . . the event in question." (RT 786.) Defense counsel acknowledged he could error, but stated that

/////

> the alleged circumstances of the purchase as they're described, are suspicious in themselves and could easily lead . . . to inferences that instead of buying it out of the back of somebody's car which suggest receiving stolen property, that in fact they were – it was taken out of the car of Mr. Clark which was driven away after he was murdered. . . .that's why my judgment is that it's too dangerous to pursue it. Opens too many doors. Creates too many possibilities.
>
> THE COURT: You haven't explained to me how it does because that's the purpose of the closed hearing.
>
> MR. SMITH: Well, the story as it's been told to me is that [petitioner], was out around midnight or so and purchased this microwave from some guy.
>
> . . .
>
> From someone that had it in the backseat of his car.
>
> THE COURT: Now, is this what your client told you?
>
> MR. SMITH: Yes.
>
> THE COURT: And [petitioner] has suggested names of people who . . . could verify that.
>
> MR. SMITH: What I'm saying is that first of all, I haven't been able to come up with anybody that – that does verify that information. Clearly, although as I – you know, I'll reinterview Mr. Talarico, I don't expect that to pan out. But you know, if it will make [petitioner] happy, I'll reinterview him. [¶] But secondly, since Mr. Clark's car was driven away and since there is a circumstantial inference that a microwave was in it because that was probably the only valuable item of property in his house, it's quite possible that the jury could infer, and the prosecution will argue, that he's just making a backhanded admission that he really was a participant in this crime. It was either an accomplice – was an accomplice to it, and that's how this microwave just showed up the same night that this guy was getting killed.

(RT 786-87.) Petitioner objected that he had not told defense counsel that he bought the microwave from someone's car, but that he bought it right there on the street where he was standing at the time. (RT 788.)

On February 1, 1993, the Marsden hearing resumed and defense counsel noted that over the weekend he had made additional efforts to confirm or verify the statements that

were previously made. (RT 875.) Counsel reported those efforts were unsuccessful: Mr. Talarico could not be reached because the address he gave the court was fictitious or incorrect. (RT 875.) Defense counsel sent his investigator to the address to inquire in the neighborhood and the investigator was unable to locate Mr. Talarico. (RT 875-76.) Petitioner advised the court that his mother had the address and phone number for Andrew Gates, but his mother was not present at that time. (RT 877.)

Defense counsel informed the court that petitioner told counsel there were two witnesses who would appear that morning to testify about the microwave, but neither showed up. (RT 878.) Defense counsel reiterated that he had tried to find Mr. Gates but had not been successful. (RT 880.) Counsel added,

> One of the alleged witnesses to this alleged transaction was [petitioner's] brother . . . who's been interviewed and made a statement to the effect that nobody else was present, which is a reason that I am inclined to think that this whole thing is a figment of somebody's imagination.

(RT 880.) Defense counsel confirmed he had interviewed petitioner's brother, James Archibald Douglas, in prison, and that James told them "unequivocally . . . [that] he, the brother, was present and no one else. (RT 880.) The trial judge expressed his concern that defense counsel or the defense investigator locate Mr. Gates so this could be resolved. (RT 881.) Defense counsel stated he would have his investigator return at 1:30 to address the court directly on the issue. (RT 881.) The trial court asked the prosecution to return to the hearing, outside the presence of the jury. (RT 883.) The trial court asked the prosecution to attempt to have Mr. Talarico return to court that afternoon, and asked defense counsel to have the investigator take the information from petitioner and also try to have the investigator present that afternoon. (RT 883.)

After defense counsel put on the record his advice to petitioner that he not take the stand in his own defense, the trial court inquired of petitioner whether he wished to take the stand contrary to the advice of counsel. (RT 884-89.) Petitioner confirmed he wished to testify over objection of defense counsel. (RT 889.)

Petitioner took the stand and testified as follows: On February 6, 1993, he purchased the microwave "from a car and their occupant," in the evening between 6:00 and 12:00. (RT 899.) A number of people were there when he purchased the microwave: his brother, James Douglas, James Russell Talarico, Andrew Gates, a man named David, petitioner's nieces Angela and Maria, and Talarico's girlfriend, whose name he did not know. (RT 900; 944.) The car was on the street "in the front of the apartment building adjacent." (RT 900.) He paid seven dollars and about ten dollars' worth of marijuana for the microwave. (RT 901.) He did not know the name of the person from whom he bought the microwave; he had never seen him before, nor had he seen him since. (RT 901.)

On cross-examination, petitioner explained that a car drove up with two black males inside, between 6:00 and 12:00 p.m., but possibly about 9:00 or 10:00 p.m, and they offered to sell him the microwave. (RT 945-46.) He was planning to buy the microwave and sell it for a profit. (RT 946.) While making the purchase, petitioner could not say whether the people standing around were paying attention to the transaction or not; he was about twenty feet away from the group of people. (RT 950.) He moved the microwave to the side of the apartment "from 6:00 to 12:00. I could picture about 9:00 to 10:00 at that time." (RT 955.) Later, petitioner carried the microwave into his sister's apartment, but no one saw him put it in the closet. (RT 956-57.)

After the defense rested, the prosecution requested a bench conference that was unrecorded, after which the trial court announced that defense counsel may reopen his defense, but in the meantime, the prosecution began calling its rebuttal witnesses. (RT 978.)

There is no further comment on the record concerning Mr. Gates or Mr. Talarico, nor reference to whether the defense investigator met with the trial judge. (RT 881; 882-1023.) However, during the prosecution case, James Talarico was asked whether he had a specific recollection of a microwave oven ever being part of one of [the victim's] yard sales." (RT 306.)

/////

Talarico responded, "I'm not sure." (RT 306.) Talarico testified he went into his apartment at 10:00 p.m. and didn't come back out again that night. (RT 309.)

The trial record does not disclose whether or not Talarico witnessed petitioner buying the microwave that evening. But during petitioner's testimony at trial he admitted he did not know whether anyone in the group twenty feet from the car had witnessed petitioner purchasing the microwave. (RT 950.) The record is similarly silent about the other witnesses proposed by petitioner during the Marsden hearings.

On habeas, petitioner has not provided any declarations or affidavits from any witnesses, either those named at the Marsden hearings or otherwise, stating that they witnessed petitioner purchase the microwave on the street that evening or that they had relevant testimony pertinent to petitioner's defense. Petitioner has offered no evidence that these witnesses would have testified in the manner he described.

> [C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.
>
> ....
>
> For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.

Strickland, 466 U.S. at 691.

A review of the Marsden transcript reflects that defense counsel had good reasons for not calling Talarico or Gates as witnesses because he was concerned that it would lead to inferences that petitioner was acknowledging a connection to the victim's stolen microwave which was contrary to the defense theory of third party culpability. This court must defer to defense counsel's informed strategic choices. Strickland, 466 U.S. at 689; Bell v. Cone, 122 S.

Ct. 1843, 1852 (2002). Indeed, petitioner took the stand to testify over defense counsel's objection.

Finally, petitioner has failed to demonstrate Strickland prejudice based on defense counsel's alleged failure to locate, interview or call these witnesses. Given the other evidence in this case, petitioner has failed to show that had any of these witnesses been called at trial there is a reasonable probability that, but for counsel's failure to call these witnesses, the result of the proceeding would have been different. This claim must fail.

b. Failure to Seek Pinpoint Jury Instruction

Petitioner claims defense counsel was ineffective because he failed to request a jury instruction or verdict form requiring the jury to identify the theory under which they found him guilty of first degree murder. Under California law, general first-degree murder verdicts are an accepted part of California criminal law. See People v. Guerra, 40 Cal.3d 377, 220 Cal.Rptr. 374, 378-79 (1985); People v. Chavez, 37 Cal.2d 656, 234 P.2d 632, 641-42 (1951) (en banc). "California continues to characterize first-degree murder as 'a single crime as to which a verdict need not be limited to any one statutory alternative." See Sullivan v. Borg, 1 F.3d 926, 928 (9th Cir. 1993) quoting Schad v. Arizona, 501 U.S. 624, ___, 111 S.Ct. at 2496 (1991). Because California law provides for a general verdict in this circumstance, defense counsel may not be found ineffective for failing to object to the general verdict form. Given this routine practice in California state courts, petitioner cannot demonstrate that had counsel objected, the trial court would have instructed the jury to identify the theory.

Petitioner alleges, in conclusory fashion, that had the jury been properly instructed, they could not have reached guilty verdicts. As noted in claim one, there was sufficient evidence for the jury to be instructed on first degree murder, and felony murder with robbery or burglary as the underlying felony. The defense theory was third party culpability, so the failure to instruct on voluntary manslaughter did not deprive petitioner of his right to a defense. Since the jury was instructed on second degree murder, but found petitioner guilty of

first degree murder, it is unlikely that had the jury been instructed on voluntary manslaughter, they would have found petitioner guilty of voluntary manslaughter rather than first degree murder. Petitioner has again failed to meet the prejudice prong of Strickland.

c. Failure to Object

Petitioner faults defense counsel for failing to object when John Miller, a Sacramento fire investigator, opined that the fire that destroyed the victim's house was arson. (RT 132-33.) Under California law, an expert witness may testify on an ultimate factual issue to be decided by the jury. See Cal. Evid. Code § 805. Here, Miller did not render an opinion about who set the fire, or implicate petitioner, but simply concluded that the fire had been set deliberately. (RT 133.) In the instant case, it was practically undisputed that the fire had been deliberately set. (RT 133.) The issue was who set the fire. Because the testimony was not improper, an objection probably would not have been successful. Therefore, petitioner cannot show that he was prejudiced by the failure to object.

Petitioner argues that defense counsel was ineffective because he failed to object when the prosecution introduced inadmissible character evidence during the case in chief. However, petitioner's argument misstates the evidence. Johnny Douglas' testimony that family members had problems with heroin was not specifically attributed to petitioner and defense counsel did object (RT 500) and after a sidebar conference the prosecution began a new line of questioning. Although the objection was not sustained on the record, it was sustained by virtue of not being revisited. Johnny Douglas also did not expressly testify that petitioner was the source of Johnny's fear for himself and his family. Although that was one inference, defense counsel cannot be deemed ineffective for failing to object to a possible inference.

Petitioner contends trial counsel should have objected to the prosecution's request to amend the information as to the arson charge. However, the record reflects that defense counsel did object:

/////

> MR. SMITH: I think it's too late in the day to amend the information after the evidence has been . . . concluded.
>
> MS. HAYES: An amendment to conform to the proof may be made at any time that the proof has been established and –
>
> THE COURT: People have rested and there really isn't any proof that the arson caused the death of Mr. Clark.
>
> MR. SMITH: To the contrary. There's proof that . . . it didn't cause the death of Mr. Clark. I think the appropriate action at this time is to dismiss that count. It's unsupported.
>
> MS. HAYES: No. The language that was mentioned didn't require us to prove that it caused the death of Mr. Clark. The arson statute reads like this, a person is guilty of arson when he or she willfully and maliciously sets fire to or burns or causes to be burned or aids, counsels, procures the burning of any structure, forest lands, or property. That's a substantive claim of . . . which he's charged.

(RT 823.) In addition, under Cal. Penal Code § 1009, "[t]he court in which an action is pending may order or permit an amendment of an indictment, accusation or information, or the filing of an amended complaint, for any defect or insufficiency, at any stage of the proceedings. . . ." Id. Thus, counsel cannot be deemed ineffective for failing to object to amendment of the charges.

Petitioner contends it was error for defense counsel not to object to the jury instruction on robbery. If defense counsel had objected to the jury instruction on robbery, the trial judgment might have been persuaded not to instruct the jury on felony murder with robbery as the underlying felony given it was unclear as to the timing of the taking of the possessions from the victim. However, even if that jury instruction were removed, the jury would still have felony murder with burglary as the underlying felony, so it is not probable that a different outcome would have resulted.

Finally, petitioner contends it was error for defense counsel not to object to the jury instruction on arson because the victim was dead before the fire was set, thus the home was not "inhabited." However, as respondent points out, People v. Ramos, 52 Cal.App.4th 300, was not decided until 1997, four years after the instant trial. Because the fire was set only hours after

the victim had been murdered, presumably by the same person, this distinction evaded even the state trial court judge.[21] It is clear from the record that defense counsel, the prosecution and the trial judge were aware that the victim was dead at the time the fire was set, and the prosecution even moved to amend the charge to delete reference to great bodily injury. The word "inhabited" was included in the information and remained after the injury reference was deleted.

However, even if defense counsel had objected and the trial court had stricken "inhabited," it is more probable that the result would have been to amend the information again to reflect the charge of arson to an uninhabited structure, which would only have sentencing consequences, not change the fact of the arson conviction. Accordingly, petitioner cannot meet the prejudice prong of Strickland.

For all of the above reasons, petitioner's ninth claim for relief should be denied.

J. Tenth Claim

Petitioner's tenth claim is that he received ineffective assistance of counsel from his appointed appellate counsel, to his prejudice, in violation of the Sixth and Fourteenth Amendments to the Constitution.

The Strickland standards apply to appellate counsel as well as trial counsel. Smith v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989). However, an indigent defendant "does not have a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points." Jones v. Barnes, 463 U.S. 745, 751 (1983). Counsel "must be allowed to decide what issues are to be pressed." Id. Otherwise, the ability of counsel to present the client's case in accord with counsel's professional evaluation

---

[21] During the conference at which the prosecution sought to amend the arson charge, the trial court attempted to strike "inhabited," but the prosecution objected:

THE COURT: You want to leave in inhabited? Does the word inhabited have the significance –

MS. HAYES: It does in terms of punishment, yes.

(RT 824.)

would be "seriously undermined." Id. See also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is not even particularly good appellate advocacy.") There is, of course, no obligation to raise meritless arguments on a client's behalf. See Strickland, 466 U.S. at 687-88 (requiring a showing of deficient performance as well as prejudice). Thus, counsel is not deficient for failing to raise a weak issue. See Miller, 882 F.2d at 1434. In order to demonstrate prejudice in this context, petitioner must demonstrate that, but for counsel's errors, he probably would have prevailed on appeal. Miller, 882 F.2d at 1434, n.9.

Petitioner's fifth claim that he was denied due process when the jury convicted him of arson causing an inhabited structure to burn, when the evidence showed that the burned structure was not inhabited at the time of the fire, had merit. Because a dead victim could not be inhabiting the property at the time the fire was set, petitioner's due process rights were violated.[22] However, at the time of petitioner's appeal, the Ramos case had not yet been decided (1997). Petitioner's appeal was decided on April 1, 1994. Thus, appellate counsel could not be expected to foresee the result of Ramos.

In addition, as noted in the ineffective assistance of counsel section above, the question of prejudice is a closer question. Had appellate counsel raised this issue and the appellate court found the structure was uninhabited, it is probable that the matter would have been remanded to the state court for modifying petitioner's sentence to a conviction of Cal. Penal

---

[22] Respondent argues that this court previously determined that petitioner's conviction of arson of an inhabited structure did not violate state law. (Supp. Answer at 40, quoting March 14, 2000 findings and recommendations issued by a previously-assigned magistrate judge, at 17 n.10.) While discussing whether petitioner had demonstrated a fundamental miscarriage of justice in the context of deciding whether petitioner's claims not raised in his petition for review were procedurally defaulted, the magistrate judge stated in a footnote "[t]here is no requirement that a living person be in the building in order for arson pursuant to § 451(b) to be committed." The findings and recommendations were adopted by the district court on August 18, 2000. However, on appeal, the district court's finding that certain claims were procedurally defaulted was reversed. (Docket No. 38.) Accordingly, the conclusion contained in the six-sentence footnote, located within the procedural default discussion, was vacated by the appellate court order.

Code § 451(c), arson of an "uninhabited" structure, rather than an order overturning the arson conviction. Because this change in sentence would not have changed the fact of the conviction, petitioner fails the prejudice prong of Strickland here as well.

As discussed above, only one claim in the second amended petition had merit. Because the balance of petitioner's claims lack merit, petitioner cannot demonstrate Strickland prejudice on those claims. Petitioner's tenth claim for relief should be denied.

K.   Eleventh Claim

Petitioner's eleventh claim was previously denied and affirmed on appeal. Douglas v. S. Cambra, 40 Fed. Appx. 356 (9th Cir. 2002), vacated on other grounds by Douglas v. Cambra, 102 Fed.Appx. 595 (9th Cir. 2004). (Docket No. 38.)

For the foregoing reasons, IT IS HEREBY RECOMMENDED that:

1.   Petitioner's fifth claim for relief be granted. Petitioner's conviction for violation of California Penal Code Section 451(b) be vacated and this matter be remanded to state court with direction that the portion of petitioner's sentence reflecting a violation California Penal Code Section 451(b) be stricken and petitioner be re-sentenced as provided in California Penal Code Section 451(c).

2.   In all other respects, petitioner's application for a writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within twenty days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that

/////

/////

/////

failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: October 31, 2007.

UNITED STATES MAGISTRATE JUDGE

/001;doug0775.157